# United States Court of Appeals for the Federal Circuit

---

**REINALDO CASTILLO, GONZALO PADRON MARINO, MAYDA ROTELLA, JULIA GARCIA, SHOPS ON FLAGER INC., JOSE F. DUMENIGO, DORA A. DUMENIGO, HUMBERTO J. DIAZ, JOSEFA MARCIA DIAZ, LUIS CRESPO, JOSE LUIS NAPOLE, GRACE BARSELLO NAPOLE, BERNARDO D. MANDULEY, NORMA A. MANDULEY, DANILO A. RODRIGUEZ, DORA RODRIGUEZ, AVIMAEL AREVALO, ODALYS AREVALO, DALIA ESPINOSA, DANIEL ESPINOSA, SOFIRA GONZALEZ, LOURDEZ RODRIGUEZ, ALBERTO PEREZ, MAYRA LOPEZ, NIRALDO HERNANDEZ PADRON, MERCEDES ALINA FALERO, LUISA PALENCIA, XIOMARA RODRIGUEZ, HUGO E. DIAZ, AND, CONCEPCION V. DIAZ, AS CO-TRUSTEES OF THE DIAZ FAMILY REVOCABLE TRUST, SOUTH AMERICAN TILE, LLC, GLADYS HERNANDEZ, NELSON MENENDEZ, JOSE MARTIN MARTINEZ, NORMA DEL SOCORRO GOMEZ, OSVALDO BORRAS, JR., LUIS R. SCHMIDT,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1158

---

Appeal from the United States Court of Federal Claims in Nos. 1:16-cv-01624-MBH, 1:17-cv-01931-MBH, Senior Judge Marian Blank Horn.

————————————

OPINION ISSUED: February 20, 2020
OPINION MODIFIED: March 6, 2020[*]

————————————

MEGHAN SUE LARGENT, LewisRice, St. Louis, MO, argued for plaintiffs-appellants. Plaintiffs-appellants Gonzalo Padron Marino, Mayda Rotella, Julia Garcia, Jose F. Dumenigo, Dora A. Dumenigo, Dalia Espinosa, Daniel Espinosa, Sofira Gonzalez, Mayra Lopez, South American Tile, LLC, Gladys Hernandez, Jose Martin Martinez, Norma del Socorro Gomez, Luis R. Schmidt, Humberto J. Diaz, Josefa Marcia Diaz also represented by LINDSAY BRINTON.

JAMES H. HULME, Arent Fox LLP, Washington, DC, for plaintiffs-appellants Reinaldo Castillo, Danilo A. Rodriguez, Dora Rodriguez.

MARK F. HEARNE, II, True North Law Group, LLC, St. Louis, MO, for plaintiffs-appellants Shops on Flager Inc., Luis Crespo, Jose Luis Napole, Grace Barsello Napole, Bernardo D. Manduley, Norma A. Manduley, Avimael Arevalo, Odalys Arevalo, Lourdez Rodriguez, Alberto Perez, Niraldo Hernandez Padron, Mercedes Alina Falero, Luisa Palencia, Xiomara Rodriguez, Hugo E. Diaz, Concepcion V. Diaz, Nelson Menendez, Osvaldo Borras, Jr. Also represented by STEPHEN S. DAVIS.

————————————

[*]    This opinion has been modified and reissued following a petition for panel rehearing filed by the government.

KEVIN WILLIAM MCARDLE, Environment & Natural Resource Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY B. CLARK, ERIC GRANT.

————————————

Before WALLACH, TARANTO, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge*

Reinaldo Castillo and others own plots of land abutting a railroad right-of-way that was long ago granted to, and for decades used by, the Florida East Coast Railway Co. in Dade County, Florida. It is undisputed before us that, when the railway company eventually abandoned the right-of-way for rail use (the purpose for which the right-of-way was granted), full rights to the underlying land— title unencumbered by the right-of-way easement—would have reverted to whoever owned such rights, had there been no overriding governmental action. But there was such governmental action: the railway company successfully petitioned a federal agency to have the railroad corridor turned into a recreational trail. The landowners sued the United States in the Court of Federal Claims, alleging that the agency's conversion of the railroad right-of-way into a recreational trail constituted a taking of their rights in the corridor land abutting their properties and that the United States must pay just compensation for that taking. To establish their ownership of the corridor land, the plaintiffs relied on a Florida-law doctrine known as the "centerline presumption," which, where it applies, provides that when a road or other corridor forms the boundary of a landowner's parcel, that landowner owns the fee interest in the abutting corridor land up to the corridor's centerline, unless there is clear evidence to the contrary.

In proceedings on summary-judgment motions, the government argued that the landowners did not own the land to the centerline of the railroad corridor at issue. The

trial court agreed with the government, holding that the only reasonable finding on the evidence in this case was that the centerline presumption was overcome or was inapplicable. *See Castillo v. United States*, 138 Fed. Cl. 707 (2018) (*SJ Op.*); *Castillo v. United States*, 140 Fed. Cl. 590 (2018) (*Reconsideration Op.*). The landowners appeal. We conclude that the trial court misapplied the centerline presumption to the evidence. We reverse and remand.

## I

## A

When a railroad stops using a railroad right-of-way to operate a rail line, Section 8(d) of the National Trails System Act Amendments of 1983 (Trails Act), 16 U.S.C. § 1247(d), "allows [the] railroad to negotiate with a state, municipality, or private group (the 'trail operator') to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail." *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004). The federal government's Surface Transportation Board (STB) has exclusive and plenary authority to "regulate the construction, operation, and abandonment of most railroad lines in the United States." *Id.* at 1228. If the railroad and trail operator reach a trail agreement during a negotiation period provided by the STB's issuance of a Notice of Interim Trail Use or Abandonment (NITU), and so notify the STB, trail use of the right-of-way is authorized and termination of the railroad easement through abandonment is blocked indefinitely. *See* 49 C.F.R. § 1152.29(d), (h); *see also Rogers v. United States*, 814 F.3d 1299, 1303 (Fed. Cir. 2015).

The Fifth Amendment's Takings Clause provides that private property shall not "be taken for public use, without just compensation." If, in the absence of a conversion to trail use, state law would provide for return to a person of full rights in the land, "[a] taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a

railroad right-of-way to trail use." *Caldwell*, 391 F.3d at 1228; *see also Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 1996) (en banc). Accordingly, the government must provide just compensation to the owner of the reversionary rights eliminated by a Trails Act conversion. *See Rogers*, 814 F.3d at 1303.

## B

In the fall of 1924, Florida East Coast Railway Co. (FEC Railway) obtained a 1.2-mile long right-of-way easement (of a basically north-south orientation) in Dade County, Florida, by way of four condemnation orders in the Dade County Circuit Court. *See* J.A. 708–09 (P. Russo judgment); J.A. 710–12 (R.S. Stanley judgment); J.A. 712–13 (W.H. Johnson judgment); J.A. 713–16 (J. Pyles judgment). The FEC Railway completed most of the rail line on the right-of-way in 1932 and soon began operations on the line as part of its South Little River Branch Line.

As relevant here, the land to the east of the right-of-way eventually came into the hands of two families: the Merwitzers and the Mosses. The Merwitzers owned the land to the east of the right-of-way obtained by FEC Railway in the P. Russo judgment. The Merwitzers acquired this land from a 1945 deed from Mr. and Ms. T.C. Hollett (the 1945 Hollett-Merwitzer deed). On September 30, 1947, the Merwitzers recorded a subdivision plat of the land, entitled "Zena Gardens." The recorded subdivision plat includes the following description:

> That Louis Merwitzer and Rebecca Merwitzer his wife owners of the S.E. ¼ of the S.E. ¼ of Section 2, Township 54 South, Range 40 East, Miami, Dade County, Florida, excepting therefrom a strip of land off the westerly side which is the right of way of the Okeechobee-Miami Extension of the Florida East Coast Railway have caused to be made the attached plat entitled "Zena Gardens."

> The Streets, Avenues and Terrace as shown together with all existing and future planting, trees and shrubbery there on are hereby dedicated to the perpetual use of the Public for proper purposes reserving to the said Louis Merwitzer and Rebecca Merwitzer, his wife, their heirs, successors or assigns, the reversion or reversions thereof whenever discontinued by law.

J.A. 759.

The Mosses owned land north of the Merwitzers' land and east of the FEC Railway right-of-way. The relevant portion of the right-of-way had been obtained by FEC Railway in the other three condemnation orders—the R.S. Stanley, W.H. Johnson, and J. Pyles judgments. The Mosses acquired this land from a 1949 deed from the Estate of Lucy Cotton (the 1949 Cotton-Moss deed). On November 3, 1949, Mr. and Ms. Moss recorded a subdivision plat of the land, entitled "Princess Park Manor." The recorded subdivision plat includes the following description:

> That ERVING A. MOSS and HARRIETT E. MOSS his wife, owners of the South ½ of the N.E. ¼, South of the Canal and East of the Florida East Coast Right-of-Way, located in Sec. 2 TWP 54 South, RGE. 40 East, Dade County Florida; being the land East of the Florida East Coast Right-of-Way and between Flagler Street and the Tamiami canal and extending East to Ludlum Road, ALSO [t]he West ½ of the Northeast ¼ of the Southeast ¼ less the Florida East Coast Right-of-Way all in Sec. 2 Township 54 South RGE. 40 East, Dade County Florida, Said Florida East Coast Right-of-Way being the right-of-way of the Okeechobee Miami Extension of the Florida East Coast Railway, have caused to be made the attached Plat entitled "Princess Park Manor."

> The Streets, Avenues, Roads, Terraces, Courts and Alleys as shown together with all existing and future planting, trees and shrubbery thereon are hereby dedicated to the perpetual use of the public for proper purposes, reserving the said ERVING A. MOSS and HARRIETT E. MOSS, his wife their heirs; successors or assigns, the reversion or reversions thereof whenever discontinued by law.

J.A. 757.

Between March 1977 and July 2016, Reinaldo Castillo, Nelson Menendez, and others acquired, by deed, title to parcels of land in Zena Gardens and Princess Park Manor. The deeds did not themselves specify the precise parcel boundaries but referred to the parcels by lot numbers within the subdivision plats. *See, e.g.*, J.A. 920 (conveying "Lot 8, in Block 11, of ZENA GARDENS, according to the Plat thereof").

On January 21, 2016, FEC Railway requested authority from the STB to abandon the right-of-way, including the portion that abuts Zena Gardens and Princess Park Manor. On November 1, 2016, Florida East Coast Industries (FEC Industries) requested issuance of an NITU. The STB granted the request and issued an NITU, which allowed FEC Industries "to negotiate with FEC [Railway] for acquisition of the Line for use as a trail under [Section 8(d) of the Trails Act]." J.A. 268. FEC Railway and FEC Industries notified the STB on July 18, 2017, that "they ha[d] entered a Purchase Sale Agreement . . . for the rail banking/interim trail use of the 1.21-mile" right-of-way. J.A. 695.

C

In December 2016, Mr. Castillo and other landowners (collectively the Castillo plaintiffs), along with Mr. Menendez and other landowners (collectively, the Menendez plaintiffs), separately sued the federal government in the

Court of Federal Claims, alleging that the STB's issuance of the NITU authorizing conversion of the FEC right-of-way into a public recreational trail constituted a taking of their property, entitling them to just compensation. The trial court consolidated the cases. After filing their pleadings, the parties stipulated that at the time the STB issued the NITU, each plaintiff owned land—in either the Zena Gardens or the Princess Park Manor subdivision—adjacent to the FEC right-of-way. The Castillo plaintiffs' corridor-abutting land is split between the two subdivisions; the Menendez plaintiffs' corridor-abutting land lies entirely in Princess Park Manor. *SJ Op.*, 138 Fed. Cl. at 714.

The Castillo and Menendez plaintiffs (collectively, the landowners) filed separate motions for partial summary judgment, asking the court to determine that the NITU constituted a taking.[1] The landowners argued that FEC Railway had only an easement over, not fee-simple title to, the land underlying the FEC right-of-way and that the easement was limited to operating a railway. They argued that the NITU constituted a taking because, in its absence, once FEC Railway abandoned use of the corridor for rail service, the landowners would have regained full

---

[1]    The Castillo plaintiffs sought partial summary judgment as to the government's liability for portions of the right-of-way granted to FEC Railway in all four condemnation orders and a portion of the right-of way obtained by a 1923 deed from G.F. and Mary Holman. *See* Castillo's Motion for Partial Summary Judgment at 1, *Castillo v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 23. The Menendez plaintiffs sought the same relief with respect to portions of the right-of-way granted to FEC Railway in three of the four condemnation orders. Menendez's Motion for Partial Summary Judgment at 1, *Menendez v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:17-cv-01931), ECF No. 20.

possession of the abutting corridor land, east of and up to the centerline, which they claimed they owned under Florida law.

The government opposed the landowners' motions and filed its own cross-motions for summary judgment. As to the Menendez plaintiffs, the government sought summary judgment that the Menendez plaintiffs could not establish that they owned the land underlying the right-of-way obtained by the railway in the condemnation orders. As to the Castillo plaintiffs, with respect to the issues now before us, the government argued that the Castillo plaintiffs had not established their entitlement to summary judgment in their favor regarding their ownership of any of the corridor land.[2]

The government's main argument was that the landowners had established ownership of only their parcels adjacent to the right-of-way and not any land underlying the right-of-way. Specifically, the government pointed to language in the September 1947 Zena Gardens plat "excepting . . . a strip of land off the westerly side which is the right of way of the . . . [FEC] Railway," J.A. 759, and language in the November 1949 Princess Park Manor plat describing the subdivision as being "east of the Florida East Coast right-of-way," J.A. 757. According to the government, that language, together with certain other language, shows that the Merwitzers and Mosses excluded the FEC right-of-way from conveyances made according to the September 1947 and November 1949 plats. Government's Cross-Motion for

---

[2]    The government sought summary judgment that FEC Railway received fee simple title to the portion of the corridor land conveyed in the 1923 deed from G.F. and Mary Holman. The trial court agreed, *SJ Op.*, 138 Fed. Cl. at 730–34, and the landowners do not challenge that aspect of the trial court's ruling.

Summary Judgment at 12–13, *Castillo v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 25.

To prove ownership of the land underlying the right-of-way, the landowners invoked a doctrine of Florida property law, *i.e.*, the centerline presumption. Under that doctrine, in its principal relevance to the issue presented to the trial court on summary judgment, if a grantor conveys property identified as bounded by a road, stream, or similar corridor, and the grantor owns the land under that boundary corridor, the grant also conveys title to the land underlying the corridor up to the corridor's centerline, unless there is clear evidence of non-conveyance as to that corridor land. Landowners' Reply in Support of Their Motion for Partial Summary Judgment at 7–9, *Castillo v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 32 (citing *Smith v. Horn*, 70 So. 435 (Fla. 1915)). According to the landowners, the 1947 and 1949 plats' descriptions and depictions, on which the government relied, failed to rebut the centerline presumption.

On June 29, 2018, the trial court resolved the summary-judgment motions in favor of the government. *SJ Op.*, 138 Fed. Cl. at 742. The trial court made similar determinations for the lots in both Zena Gardens and Princess Park Manor, namely, that there is no genuine issue of triable fact because the plat descriptions and depictions of the subdivisions rebut the centerline presumption by clearly showing that the Merwitzers and Mosses "did not intend to pass title to the railroad corridor to the grantees of the subdivision parcels adjacent to the railroad corridor." *Id.* at 740, 742. In particular, the trial court concluded that the Zena Gardens plat "makes a specific point to 'except[]' the railroad corridor from the description of [the] land platted," *id.* at 740, and that the Princess Park Manor plat describes the parcels in the plat as both "East of the [FEC Railway] Right-of-Way" and "less the [FEC Railway] Right-of-Way," *id.* at 741, thus excluding the railroad corridor. In the trial court's view, the absence of the railroad right-of-

way from the paragraph in both plat descriptions dedicating the "Streets" and "Avenues" to the public confirms that the individual lot conveyances did not include the railroad right-of-way. *Id.* at 740, 741. Finally, again relying just on the plats, the court concluded that the pictorial depictions of the subdivisions in the plats indicate that none of the parcels "extend onto the railroad corridor but, instead, end at the edge of the railroad corridor," meaning that the railroad corridor is not included in the subdivision plat. *Id.*

The landowners filed motions for reconsideration, arguing that the trial court misapplied the centerline presumption.[3] To prove that the Merwitzers and Mosses did not retain for themselves a fee estate in the strip of land under the right-of-way easement, the landowners presented, for the first time, two pre-platting chain of title reports—one for a parcel in Zena Gardens and one for a parcel in Princess Park Manor. *See* J.A. 880–81; J.A. 882–84 (Zena Gardens parcel chain of title report); J.A. 928–30 (Princess Park Manor parcel chain of title report). The Zena Gardens report included the 1945 Hollett-Merwitzer deed, and the Princess Park Manor report included the 1949 Cotton-Moss deed. In response, the government submitted a 1937 quitclaim tax deed that, the government asserted, showed a conveyance of the land underlying the

---

[3]    The Castillo landowners also argued that the trial court erred by granting summary judgment in favor of the government for the portions of the FEC right-of-way obtained by condemnation order because the government had not moved for summary judgment with respect to those portions of the right-of-way. The trial court rejected the argument without disputing the premise about the limited scope of the government's motion. *Reconsideration Op.*, 140 Fed. Cl. at 604–05. On appeal, the Castillo plaintiffs have not challenged that procedural ruling.

FEC right-of-way from the Southern Drainage District directly to the FEC Railway.

On October 30, 2018, the trial court denied the landowners' motions for reconsideration. *See Reconsideration Op.*, 140 Fed. Cl. at 606. The trial court found no clear error in its determination that the Merwitzers (in September 1947) and the Mosses (in November 1949) made clear their intent not to convey title to the land underlying the FEC right-of-way. *Id.* at 601. The trial court then considered the pre-platting chain of title reports submitted by the landowners and found that these reports were public records available to the landowners at the time they filed their summary-judgment motions, and thus "should not have been left for a post-decision motion for reconsideration." *Id.* Nonetheless, the trial court considered the reports and adopted a new basis to reject the landowners' claims, namely, that the Merwitzers and Mosses did not themselves own the land underlying the right-of-way when the subdivisions were platted. *Id.* at 601–02. The trial court supported this determination with the language of the 1945 Hollett-Merwitzer deed and the 1949 Cotton-Moss deed. *Id.* The trial court ruled that the 1945 Hollett-Merwitzer deed conveyed land "less [the] certain strip of land" that is the right-of-way and that the 1949 Cotton-Moss deed stated that the land conveyed was "East of the [FEC] right-of-way" and "less the [FEC] Right-of-Way." *Id.* (quoting J.A. 897, 943). The trial court did not address the 1937 quitclaim tax deed submitted by the government.

The landowners timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review a decision of the Court of Federal Claims granting summary judgment de novo. *See Rogers*, 814 F.3d at 1305. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Court of Federal Claims Rule 56(a). We review the denial of a motion for reconsideration for an abuse of discretion. *See Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1363 (Fed. Cir. 2008). "An abuse of discretion occurs when a court misunderstands or misapplies the relevant law or makes a clearly erroneous finding of fact." *Id.*

We analyze the property rights of the parties in a rails-to-trails case under the relevant state's law, which in this case is Florida law. *Rogers*, 814 F.3d at 1305. We decide legal issues, under federal or state law, de novo. *Hash v. United States*, 403 F.3d 1308, 1312 (Fed. Cir. 2005).

## A

The landowners argue that the trial court misapplied the centerline presumption under Florida law. Specifically, they argue that the court, in its summary-judgment opinion, improperly interpreted the Zena Gardens and Princess Park Manor plats as reserving a reversionary interest in the FEC right-of-way to the Merwitzers and Mosses, so that the subsequent deeds to the subdivision parcels at issue did not grant any ownership of land in the railroad corridor. We agree with the landowners.

Long ago, the Supreme Court of the United States described the centerline presumption as a "familiar principle of law" to the effect that "a grant of land bordering on a road or river, carries the title to the centre of the river or road, unless the terms or circumstances of the grant indicate a limitation of its extent by the exterior lines." *Banks v. Ogden*, 69 U.S. 57, 68 (1864). A note to the Florida Supreme Court's 1887 decision in *Florida Southern Railway Co. v. Brown* described the rule as applicable to a "deed describing land as bounded by a street or other way," rather than "as being bounded by the side line of the street": the deed "passes all the title of the grantor in and to the soil of such way, extending to the center line thereof, subject to the easement of the public, in the absence of an express or

implied reservation of such street or way." 1 So. 512, 515 (Fla. 1887). In 1915, the Florida Supreme Court in *Smith v. Horn* applied the centerline presumption to the streets of a subdivision plat:

> Where the owner of land has it . . . platted, showing subdivisions thereof, with spaces for intervening streets . . . and conveyances in fee of the subdivisions are made with reference to such . . . plat, the owner thereby evinces an intention to dedicate an easement in the streets or other highways to the public use . . . and the title of the grantees of subdivisions abutting on such streets in the absence of a contrary showing, extends to the center of such highway, subject to the public easement.

70 So. 435, 436 (Fla. 1915); *see also Servando Bldg. Co. v. Zimmerman*, 91 So. 2d 289, 293 (Fla. 1956) (recognizing that Florida codified the centerline presumption in part for subdivision plats at Fla. Stat. § 177.08 (1955), now § 177.085); *Seaboard Air Line Ry. v. Southern Inv. Co.*, 44 So. 351, 353 (Fla. 1907) ("The proprietor of lots abutting on a public street is presumed, in the absence of evidence to the contrary, to own the soil to the center of the street." (internal quotations omitted)).[4]

The centerline presumption can be rebutted in two ways of relevance here. First, the party challenging the presumption may "present evidence of the grantor's intent

---

[4]    In a recent case, the Florida Supreme Court declined to consider "whether or to what extent t[he] 'center line presumption' rule still applies to property adjacent to streets and highways in Florida today." *Rogers v. United States*, 184 So. 3d 1087, 1099 n.7 (Fla. 2015). At present, the rule is a fixture of Florida law. *See, e.g., Bischoff v. Walker*, 107 So. 3d 1165 (Fla. Dist. Ct. App. 2013) (Florida court applying centerline presumption).

not to convey to the centerline" of the easement. *Bischoff v. Walker*, 107 So. 3d 1165, 1171 (Fla. Dist. Ct. App. 2013). Second, a party can show that "the strip of land being claimed is titled in someone else." *Rogers v. United States*, 184 So. 3d 1087, 1098 (Fla. 2015).

We have not been pointed to a decision under Florida law that specifically rules on a contested issue about whether railroad rights-of-way, like streets and certain other corridors, come within the centerline presumption. But in the absence of a contrary indication under Florida law, we conclude that the centerline presumption applies to railroad rights-of-way that serve as boundaries of a plot, including a plot within a subdivision.

Florida courts have applied the centerline presumption to highways, streets, canals, and nonnavigable streams. *See, e.g.*, *Smith*, 70 So. at 436 (applying centerline presumption to "nonnavigable stream or highway"); *Bischoff*, 107 So. 3d at 1168–71 (applying centerline presumption to a canal). In both *Florida Southern Railway* and *Seaboard Air Line Railway*, the boundary involved was a street being used by a railway, though not exclusively. A railroad right-of-way is relevantly akin to other corridors: it comes within the core rationale of the centerline presumption. When a property description includes a two-dimensional corridor (having width as well as length) as a boundary, that boundary often needs to be translated into one or more one-dimensional boundaries to identify ownership, such as when the right-of-way use of the corridor ends; and the centerline presumption supplies a default rule to perform that important task—with the content of the rule being a presumption that the corridor, commonly a narrow strip, is not to be owned separately from the abutting land. *See, e.g.*, Dale A. Whitman et al., *The Law of Property* § 11.2 at 713, 719 (4th ed. 2019) ("deeds, to be valid, must describe or otherwise identify the land affected," and "[m]onuments having significant width," such as "public streets and highways," "raise interesting problems" of precisely

identifying the lines that bound the land; the centerline presumption solves that problem).  The translation problem solved by the centerline presumption is presented by railroad rights-of-way as by other corridors.

Moreover, in *Bischoff*, the Florida District Court of Appeals described the centerline presumption as applying to a boundary defined by a "monument."  *See Bischoff*, 107 So. 3d at 1168 ("The presumption is that ownership extends to the centerline of a monument . . . .").  Florida Statute § 472.005(11) defines a "monument" as "an artificial or natural object that is permanent or semipermanent and used or presumed to occupy . . . any point on a boundary line, or any reference point or other point to be used for horizontal or vertical control."  A rail line meets the definition of an artificial monument under Florida law.

Many other jurisdictions—very much the predominant number among those whose law has been cited to us—have applied the centerline presumption to railroad rights-of-way.  *See Asmussen v. United States*, 304 P.3d 552, 558 (Colo. 2013) (finding that a majority of jurisdictions have "held that the centerline presumption applies to a conveyance of property abutting a railroad right-of-way"); *Boyles v. Missouri Friends of the Wabash Trace Nature Trail, Inc.*, 981 S.W.2d 644, 650 (Mo. Ct. App. 1998) (applying centerline presumption to railroad right-of-way); *Pebsworth v. Behringer*, 551 S.W.2d 501, 504 (Tex. Civ. App. 1977) (same); *Church v. Stiles*, 10 A. 674, 675 (Vt. 1887) (same); *see also* Whitman et al., *The Law of Property* § 11.2 at 719 ("A similar rule making the center line the boundary is applied to railroad and other rights of way.").  *But see, e.g.*, *Stuart v. Fox*, 152 A. 413, 418–19 (Me. 1930) (finding "no reason . . . because of analogy to extend the [centerline presumption, as applied to highways,] to railroad rights of way").

We conclude that, under Florida law, the centerline presumption applies to the railroad right-of-way context of the present case.

B

In its summary-judgment opinion, the trial court concluded that the Zena Gardens and Princess Park Manor plats each contain a clear expression of an intent to reserve a reversionary interest in the FEC right-of-way in the subdivision grantors—an expression that suffices to rebut the centerline presumption. *SJ Op.*, 138 Fed. Cl. at 738–42. For Zena Gardens, the trial court relied on the plat's reference to "excepting therefrom a strip of land off the westerly side which is the right of way," *id.* at 739–40 (citing J.A. 759), and for Princess Park Manor, the trial court relied on the plat's references to the land conveyed being "East of the [FEC] Right-of-Way" and "less the [FEC] Right-of-Way," *id.* at 741 (citing J.A. 757). The landowners argue that under Florida law, the plats do not clearly express the intent required to avoid application of the centerline presumption. We agree.

The centerline presumption is said "to be based on the supposed intention of the parties, and the improbability of the grantor desiring or intending to reserve his interest in the street" when passing title to the adjoining land. *Fla. Southern Ry.*, 1 So. at 513–14. Thus, a party may rebut the centerline presumption by "present[ing] evidence of the grantor's intent not to convey to the centerline" of the railway. *Bischoff*, 107 So. 3d at 1171. This contrary intent must be "clearly expressed." *Servando*, 91 So. 2d at 293; *see Bischoff*, 107 So. 3d at 1168 ("The presumption is that ownership extends to the centerline of a monument unless a contrary intent is clearly expressed.").

The trial court in the present matter relied on language of the Zena Gardens and Princess Park Manor plats that is not sufficient to avoid the centerline presumption. It relied on "east of" and "less" language in the Princess Park Manor

plat and on "excepting" language in the Zena Gardens plat. But the relied-on language uses terminology to which the presumption remains applicable, in that the language used refers to the two-dimensional corridor (not a one-dimensional edge) or even to the right-of-way itself (as an easement) in affirmatively stating the boundary of the subdivision land and identifying certain exclusions.

In *Bischoff v. Walker*, a Florida appellate court determined that the centerline presumption applied to—and was not rebutted by—a canal adjacent to land described as "lying East of [the] Canal." 107 So. 3d at 1166–68. That language did not refer to the edge of the Canal as the boundary. The "East of the [FEC] Right-of-Way" language in the Princess Park Manor plat is nearly identical to the plat language in *Bischoff*, except the two-dimensional monument named as a boundary is not a canal but a railroad corridor.

In *Dean v. MOD Properties, Ltd.*, a Florida appellate court held that a deed conveying the entire parcel "less and except the following described [road right-of-way] easement" did not exclude the land of the road from application of the centerline presumption. 528 So. 2d 432, 432–33 (Fla. Dist. Ct. App. 1988). The court held that the language "served simply to exclude the recorded *easement* in favor of the [easement beneficiary] from the title interest being conveyed and to prevent the recorded easement from constituting a breach of the covenants of warranty in each deed." *Id.* at 434. Here, the "less the [FEC] Right-of-Way" language in the Princess Park Manor plat and the "excepting therefrom a strip of land" language in the Zena Gardens plat are relevantly similar to the language held insufficient to avoid the centerline presumption in *Dean*. The government notes that the Zena Gardens description refers to the "strip of land," whereas *Dean* involved "easement" language, but we do not think that difference calls for a different result. The Zena Gardens language states that the "strip of land . . . is the right of way . . . of the [FEC]

Railway." J.A. 759. That language is so readily susceptible to being understood as merely indicating that certain land is subject to a right-of-way use right that it does not meet the standard of clear expression of an intent to exclude underlying land-ownership rights from the property description.

Our conclusion is reinforced by the plats' clauses stating reservations as to the "Streets, Avenues and Terrace" in Zena Gardens, J.A. 759, and the "Streets, Avenues, Roads, Terraces, Courts, and Alleys" in Princess Park Manor, J.A. 757. Both plats grant easements in *those* areas to the "perpetual use of the public for proper purposes" and "reserve to the [grantors] . . . the reversion or reversions thereof whenever discontinued by law." J.A. 757, 759. We assume, without deciding, that this reservation language would suffice to avoid the centerline presumption under *Peninsular Point, Inc. v. South Georgia Dairy Co-op*, 251 So. 2d 690, 691, 693 (Fla. Dist. Ct. App. 1971) (holding that presumption avoided by grantor's dedication of streets to public use, "reserving unto itself . . . the reversion or reversions of the same, whenever abandoned by the public or discontinued by law"). But these reservation provisions conspicuously do not include the railroad corridor or right-of-way, even though the railroad right-of-way is mentioned elsewhere in the plats. The omission from the reservations confirms the absence of a reservation by the grantors as to the railroad corridor.

The trial court stated that the plats' pictorial depictions show that "none of the parcels belonging to the [land-owners] extend onto the railroad corridor but, instead, end at the edge of the railroad corridor." *SJ Op.*, 138 Fed. Cl. at 740, 741. But the maps do not allow a conclusion that the standard of clear expression of exclusion is met. It is not truly clear what the plats' maps of the two subdivisions, standing alone, show about what parts of the FEC right-of-way are outside the west boundary line of the subdivisions. *See* J.A. 757, 759. In any event, the subdivision plat "must

be construed as a whole . . . and every part of the instrument be given effect." *Florida East Coast Ry. Co. v. Worley*, 38 So. 618, 622 (Fla. 1905); *see also North Lauderdale Corp. v. Lyons*, 156 So. 2d 690, 692 (Fla. Dist. Ct. App. 1963). The plats' verbal descriptions, as discussed above, mean that the plats as a whole provide less than a clear expression of exclusion of the railroad corridor from the land within the subdivisions or the parcels to be sold within them.

We conclude, for those reasons, that the trial court erroneously granted summary judgment in its original ruling as to the land at issue on appeal. That ruling rests on the conclusion that the Zena Gardens and Princess Park Manor plats, from September 1947 and November 1949, respectively, contain clear expressions of exclusion of the railroad corridor from the subdivisions whose parcels were to be conveyed to purchasers. That conclusion, we hold, is contrary to law.

C

Although the government defends the trial court's original ruling, Government's Brief at 40–43, the government's primary argument on appeal is that this court should affirm on a different ground. Specifically, it argues that the record of transfers *to* the Merwitzers and Mosses (or their predecessors) regarding the railroad-corridor land at issue makes clear that the Merwitzers and Mosses did not actually own the corridor land at issue when they filed the plats for Zena Gardens in September 1947 and for Princess Park Manor in November 1949. *Id.* at 26–39. The trial court did not so conclude in originally granting summary judgment. But on reconsideration it considered the issue based on evidence that the landowners themselves submitted in seeking reconsideration, and after deeming the submissions too late, it seemingly endorsed the government's contention. *Reconsideration Op.*, 140 Fed. Cl. at 601–02. We hold that summary judgment in the government's favor on this issue is erroneous on this record.

The government argues that for the centerline presumption to apply, the landowners must first affirmatively establish, through pre-platting evidence, that the Merwitzers and Mosses owned the land underlying the FEC right-of-way.  Government's Brief at 20–26.  The trial court did not so conclude.  It recognized, instead, that "the center line presumption can be *rebutted*" by "evidence that the grantor did not own the land underlying the easement at issue."  *SJ Op.*, 138 Fed. Cl. at 738 (emphasis added).  That treatment accords with the Florida Supreme Court's ruling in *Jacksonville, Tampa & Key West Railway Co. v. Lockwood* that "the presumption arising from the deed from [a grantor], conveying the land, and bounding it on the east by [a roadway], is, in the absence of proof to the contrary, that [the grantor] owned to the center of the street."  15 So. 327, 329 (Fla. 1894).  The government has not shown that Florida law required the landowners, in order to withstand summary judgment, to present affirmative proof of the Merwitzers' and Mosses' ownership of the at-issue part of the railroad corridor at the time of the 1947 and 1949 plats.  In the absence of such a requirement, the government also has not shown waiver by the landowners as to pre-platting ownership issues.

If the government wishes to challenge the Merwitzers' and Mosses' ownership of the disputed land when filing their plats, it must present evidence of the transfers through which the Merwitzers and Mosses ultimately came to own what the plats presumptively include.  But the record may not be fully developed on this issue.  It is not clear to us that the government even sought summary judgment on this ground without relying on an incorrect legal contention that the landowners had the burden to establish what

the Merwitzers and Mosses owned when filing their plats in 1947 and 1949.[5]

At least some of the pre-platting property documents to which we have been pointed themselves use the FEC right-of-way as a boundary. *See* J.A. 897 (1945 Hollett-Merwitzer deed conveying land "less that certain strip of land off the Westerly portion . . . being bounded . . . on the East by a line parallel to and 50 feet East of Center Line of the Okeechobee-Miami Extension of the Florida East Coast Railway"); J.A. 943 (1949 Cotton-Moss deed conveying "the land East of the [FEC] Right-of-Way" and "less the [FEC] Right-of-Way"). Interpreting such documents, like interpreting the plats themselves, requires use of the centerline presumption to the extent it applies. The trial court's discussion of pre-platting issues in the reconsideration order may have been colored by an understanding of the presumption that we have determined to be incorrect in rejecting the trial court's original summary-judgment ruling.[6]

---

[5]    *See* Government's Memorandum in Support of Cross-Motion for Summary Judgment at 10–14, *Castillo v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 25; Government's Reply in Support of Cross-Motion for Summary Judgment at 3–5, *Castillo v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 34; Government's Memorandum in Support of Cross-Motion for Summary Judgment at 9–10, *Menendez v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:17-cv-01931), ECF No. 21; Government's Reply in Support of Cross-Motion for Summary Judgment at 2–5, *Menendez v. United States*, 138 Fed. Cl. 707 (2018) (No. 1:16-cv-01624), ECF No. 24.

[6]    The trial court did not rely on the quitclaim deed executed by the Southern Drainage District to the FEC Railway in 1937, which the government submitted on reconsideration as relevant to the Zena Gardens subdivision.

On the record before us, we conclude that the government has not justified summary judgment that the Merwitzers and Mosses did not own the corridor land now at issue when they filed their plats. Further proceedings, including such record development as is appropriate, are warranted on that issue. We do not prejudge what conclusion may be justified on remand, whether or not the evidentiary record is supplemented.

---

Under the summary-judgment standard requiring evidence to be viewed favorably to the nonmoving party, *see Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994), the 1937 deed indicates, at most, that the FEC Railway fell behind on its drainage-tax payments owed to the District and that, to clear the debt, the FEC Railway paid the unpaid drainage taxes for 1932–1936 and received from the District, in return, the quitclaim deed reflecting the clearance and removal of the District's tax lien. Under Florida law, the 1937 quitclaim deed conveyed only such "title or interest as possessed by the grantor [here, the Southern Drainage District] at the time of the making of the deed." *See Florida East Coast Ry. Co. v. Patterson*, 593 So. 2d 575, 577 (Fla. Dist. Ct. App. 1992). Moreover, "the execution of a quitclaim deed, without more, does not necessarily import that the grantor possesses any interest at all and if the grantor has no interest in the land described at the time of conveyance, the quitclaim conveys nothing to the grantee." *Miami Holding Corp. v. Matthews*, 311 So. 2d 802, 803 (Fla. Dist. Ct. App. 1975). The government has not presented evidence that the Southern Drainage District had ownership interests in the corridor land at the time of the quitclaim deed. Accordingly, the evidence does not support the government's summary-judgment position that the FEC Railway acquired fee title through the 1937 quitclaim deed.

## III

For the foregoing reasons, the decision of the trial court is reversed with respect to the portions of the FEC Railway right-of-way related to the condemnation orders. The portion of the trial court's summary-ruling not challenged on appeal, *see* note 2, *supra*, is not disturbed. We remand the case for further proceedings, including any appropriate further development of the factual record.

Costs awarded to appellants.

**REVERSED AND REMANDED**